# IN THE UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF NEW MEXICO

**WALTER PATRICK LIMACHER,**
**GEORGE LUEVANO,**
**WILHELMINA H. LUEVANO,**
and **JOE SANCHEZ,**

      Plaintiffs,

    vs.                                        No. **02-CV-477 MCA/LCS** (ACE)

**MICHAEL HURD, JALAYNE SPIVEY**,
a/k/a Jalayne Spiey, **KENNETH L. CRAMER**,
**GLENDA LONG, HUBERT QUINTANA,**
and **STATE OF NEW MEXICO,**

      Defendants.

## MEMORANDUM OPINION AND ORDER
## DENYING MOTION FOR PRELIMINARY INJUNCTION

**THIS MATTER** comes before the Court on Plaintiffs' Motion for a Temporary Restraining Order and/or Preliminary Injunction [Doc. No. 20] filed on June 19, 2002. The Court held hearings on Plaintiffs' motion in Albuquerque, New Mexico on July 15, 2002 and July 25, 2002, at which all parties appeared through counsel. Having considered the pleadings of record, the relevant law, the arguments and evidence presented by counsel, and being otherwise fully advised in the premises, the Court **DENIES** Plaintiffs' motion for the reasons stated below.

**I.     FACTUAL AND PROCEDURAL BACKGROUND**

1. At all times material to Plaintiffs' complaint, Plaintiffs Walter Patrick Limacher, George Luevano, Wilhemina H. Luevano, and Joe Sanchez were owners of water rights in the Rio Ruidoso that were adjudicated by the District Court of Chaves County, New Mexico in State of New Mexico ex rel. Reynolds v. L.T. Lewis, Nos. 20294 and 22600 (consolidated) (offers of judgment and orders filed June 26, 1979; Nov. 26, 1979; and Jan. 2, 1980).

2. A point of diversion associated with Plaintiffs' water rights is the F. Hilbern Ditch, which diverts on the North Bank of the Rio Ruidoso near San Patricio, New Mexico. Plaintiff Limacher uses the water he receives through the F. Hilbern Ditch to irrigate approximately fifty acres of pasture that he uses for livestock grazing.

3. Plaintiff Limacher's ownership of water rights is not in dispute.

4. Plaintiff Limacher's right to divert water from the F. Hilbern Ditch is not in dispute.

5. The matter in dispute is the manner in which Plaintiffs seek to divert water from the Rio Ruidoso to the F. Hilbern Ditch.

6. Plaintiff Limacher has filed an application for a second supplemental well for the acreage on his property associated with the F. Hilbern Ditch, which is currently pending before the Office of the State Engineer. In addition to the acreage associated with the F. Hilbern Ditch, Plaintiff Limacher's property encompasses approximately thirty acres of pasture that can be irrigated by a river pump, as well as approximately fifteen acres of

pasture that can be irrigated by means of the San Patricio Ditch, or a supplemental well associated with that ditch. The San Patricio Ditch currently is not providing water to Plaintiff Limacher because he refuses to pay his dues to the San Patricio Ditch Association.

7. At all times material to Plaintiffs' Complaint, the diversion works for the F. Hilbern Ditch were located on lands owned by Defendant Michael Hurd.

8. At all times material to Plaintiffs' complaint, Defendants Glenda Long and Hubert Quintana were employees of Defendant Hurd, or businesses in which Defendant Hurd has an ownership interest.

9. At all times material to Plaintiffs' complaint, Defendant Kenneth L. Cramer was employed by Lincoln County, New Mexico as a Deputy Sheriff.

10. At all times material to Plaintiffs' complaint, Defendant Jalayne Spivey was employed by the Roswell District Office of the State Engineer of New Mexico as a Water Resource Specialist II. Defendant Spivey's duties included administration and enforcement regarding water rights in the basin where the point of diversion for the F. Hilbern Ditch is located.

11. In or about June 2001, Plaintiff Limacher and his employees constructed a dam on the Rio Ruidoso for the purpose of diverting water to the F. Hilbern Ditch.

12. In the months of June and July of 2001, Defendant Spivey received complaints from Defendant Quintana and other users of water from the Rio Ruidoso that there was no flow of water in the river below the diversion point for the F. Hilbern ditch and that all water flowing in the river at that point had been diverted into the F. Hilbern ditch by means of a

dam that had recently been constructed from bank to bank using rocks, wooden poles, and a plastic tarp.

13. On or about July 7, 2001, after conferring with Defendant Spivey, Defendant Quintana took down a portion of the recently constructed dam to allow some water to flow in the Rio Ruidoso downstream of the diversion point for the F. Hilbern Ditch.

14. The next day Plaintiff Limacher, or employees acting under his direction, rebuilt the dam to its full height. After noticing that the dam had been rebuilt, Defendant Quintana again took down a portion of the dam on or about July 8, 2001, to allow some water to flow in the Rio Ruidoso downstream of the diversion point for the F. Hilbern Ditch.

15. On or about July 11, 2001, Plaintiff Limacher complained to the Lincoln County Sheriff's Office about individuals diverting his irrigation water. Deputy Sheriff Patrick O'Brien commenced an investigation of Plaintiff Limacher's complaint and, as part of that investigation, contacted Defendant Spivey, Defendant Hurd, and Plaintiff Limacher, among others.

16. On or about July 12, 2001, Defendant Spivey visited the site of the dam and confirmed that it was diverting all of the water flowing in the Rio Ruidoso to the F. Hilbern Ditch. After researching the files of the Office of the State Engineer and interviewing several witnesses, Defendant Spivey concluded that Plaintiff Limacher did not have any permits, or other legal authority, to construct the dam that diverted the entire flow of the river into the F. Hilbern Ditch. Defendant Spivey also concluded that the dam had the effect of impairing

the senior water rights of downstream users, resulted in erosion of the river bank, and left pools of stagnant water downstream.

17. Based on the results of Defendant Spivey's investigation, the Chief of the State Engineer's Water Rights Division, Paul Saavedra, issued a Compliance Order dated July 16, 2001. The Compliance Order directed Defendant Hurd to breach the dam located on his property by July 20, 2001, and to return the ditch heading to its original state.

18. On or about July 19, 2001, employees of Defendant Hurd removed the dam and Defendant Spivey delivered a copy of the Compliance Order to one of Plaintiff Limacher's employees.

19. In a letter addressed to the State Engineer and Gary Mitchell dated July 28, 2001, Plaintiff Limacher acknowledged receiving a copy of the Compliance Order and indicated, among other things, that he was obtaining water from sources other than the F. Hilbern Ditch.

20. On or about August 10, 2001, Defendant Cramer, along with another police officer, responded to a complaint that individuals were building a dam on the Rio Ruidoso. Defendant Cramer and the other officer went to the property of Defendant Hurd, where they observed that the padlock to the gate had been cut and that Plaintiff Limacher, Plaintiff George Luevano, and Michael D. Martinez were rebuilding the dam. After making these observations, Defendant Cramer informed the three men that they needed to leave because they were trespassing. Plaintiff Limacher refused to leave and was arrested and transported to the Lincoln County Detention Center.

21. In an undated letter received by the Office of the State Engineer on August 23, 2001, Gary Mitchell, acting as counsel for Plaintiff Limacher, requested a hearing on the Compliance Order as well as a negotiation "to hopefully resolve a conflict prior to the hearing." Mr. Mitchell and the State Engineer's staff disagree about whether an informal resolution of the matter was reached through negotiation and what communications occurred as part of that negotiation.

22. On or about September 13, 2001, Defendant Spivey and Art Mason, the State Engineer's District II Supervisor, conducted a site inspection of the Rio Ruidoso at the diversion point for the F. Hilbern Ditch. At that time, Defendant Spivey observed that there was some flow of water both in the ditch and in the river downstream from the ditch, that the dam across the river at that location had been partially rebuilt, and that the flow of water into the F. Hilbern Ditch was impeded by a build-up of silt and trash.

23. On or about April 9, 2002, Plaintiffs filed a civil action in the State of New Mexico's Twelfth Judicial District Court. On or about April 29, 2002, Defendants Spivey and the State of New Mexico filed a notice of removal in that civil action, and the case was removed to this Court. No objections to the removal were filed within the thirty-day period set forth in 28 U.S.C. § 1447(c) (2000).

24. On or about June 19, 2002, Plaintiffs filed their Motion for a Temporary Restraining Order and/or Preliminary Injunction in this case requesting that the Court enjoin Defendants Hurd, Long, and Quintana (collectively "the Hurd Defendants") from interfering

with Plaintiffs' use, operation, maintenance, repair, and access to the diversion dam and weir associated with the F. Hilbert Ditch.

25. On or about June 28, 2002, Defendant Spivey conducted a site inspection of the Rio Ruidoso at the diversion point of the F. Hilbern Ditch. At that time, it appeared to Defendant Spivey that nobody had cleaned the ditch since her last visit. She also observed that the ditch contained stagnant water up to the point of the culvert, that the dam had been breached, that the materials used to construct the dam had been washed downstream, and that the river was flowing downstream of the diversion point for the ditch. Defendant Spivey also observed certain portions of Plaintiff's property that appeared green and irrigated with standing water.

## II. LEGAL ANALYSIS AND CONCLUSIONS OF LAW

Both parties have been afforded the opportunity to present evidence and brief the issues raised by Plaintiffs' motion. Accordingly, the procedural requirements for issuing a temporary restraining order under Fed. R. Civ. P. 65(b) do not apply in this case. Instead, the Court focuses its inquiry on whether there are grounds for issuing a preliminary injunction pursuant to Fed. R. Civ. P. 65(a).

Neither the Federal Rules of Civil Procedure, nor any specific statute set forth a substantive standard for granting preliminary injunctive relief that is applicable in this case. Thus, the Court evaluates Plaintiffs' motion according to traditional equitable principles governing the issuance of preliminary injunctions. Because injunctions are a form of equitable relief, "[a] party seeking an injunction from a federal court must invariably show

that it does not have an adequate remedy at law." Northern Cal. Power Agency v. Grace Geothermal Corp., 469 U.S. 1306, 1306 (1984) (citing Hillsborough v. Cromwell, 326 U.S. 620, 622 (1946)); accord Sweeten v. Sneddon, 463 F.2d 713, 715 (10th Cir. 1972). In order to establish grounds for preliminary injunctive relief, Plaintiffs also must show that they will suffer irreparable injury unless the injunction issues; that the threatened injury to Plaintiffs outweighs the harm the injunction may cause to others; that the injunction, if issued, would not be adverse to the public interest; and that there is a substantial likelihood that Plaintiffs will succeed on the merits. See Elam Constr., Inc. v. Reg'l Transp. Dist., 129 F.3d 1343, 1346-47 (10th Cir. 1997); 13 James Wm. Moore, Moore's Federal Practice § 65.22[1][a], at 65-41 to 65-42 (3d ed. 2002). The burden is on Plaintiffs to show that these equitable factors weigh in their favor, see Automated Mktg. Sys, Inc. v. Martin, 467 F.2d 1181, 1183 (10th Cir. 1972), and such a showing must be "clear and unequivocal," SCFC ILC, Inc. v. VISA USA, Inc., 936 F.2d 1096, 1098 (10th Cir. 1991).

The central legal claim on which Plaintiffs request for preliminary injunctive relief is premised is that the Hurd Defendants acted unlawfully and in violation of Plaintiffs' property rights when they caused the removal of, or prevented the reconstruction of, the type of diversion dams that Plaintiff Limacher built, or attempted to build, on the Rio Ruidoso during the Summer of 2001. The Hurd Defendants respond that they have a continuing obligation to breach such dams under the terms of the Office of the State Engineer's Compliance Order dated July 16, 2001. Thus, Plaintiffs' challenge to the lawfulness of the

Hurd Defendants' conduct amounts to a collateral attack on the Office of the State Engineer's Compliance Order.

As the property rights at issue in this case are creatures of state law, Plaintiffs' claims must be evaluated in the context of New Mexico's statutory scheme for the appropriation and use of the State's surface waters. See generally N.M. Stat. Ann. ch. 72 (Michie 1978 & Supp. 1997) (setting forth water laws of the State of New Mexico). Under New Mexico law, "[a]ll waters flowing in streams and watercourses . . . within the limits of the state of New Mexico, belong to the public and are subject to appropriation for beneficial use." Id. § 72-1-1; see State ex rel. Reynolds v. Luna Irrigation Co., 80 N.M. 515, 516, 458 P.2d 590, 591 (1969). The State Engineer "has general supervision of waters of the state and of the measurement, appropriation, [and] distribution thereof." § 72-2-1.

Under New Mexico's statutory scheme, the State Engineer "may issue orders necessary to implement his decisions and to aid him in the accomplishment of his duties. In order to accomplish its purpose, this provision is to be liberally construed." Id. § 72-2-8(A). "Any regulation, code or order issued by the state engineer is presumed to be in proper implementation of the provisions of the water laws administered by him." Id. § 72-2-8(H); see State ex. rel. State Engr. v. Lewis, 1996-NMCA-019, 121 N.M. 323, 327, 910 P.2d 957, 961.

> When a person, pursuant to a finding of fact, violates a requirement or prohibition of Chapter 72 NMSA 1978, a rule adopted by the state engineer pursuant to those laws, a condition of a permit or license issued by the state engineer pursuant to those laws or an order entered by a court adjudicating a water right, the state engineer may, in addition to any other remedies available

> under law, issue a compliance order stating with reasonable specificity the nature of the violation and requiring compliance within a specified time period.

Id. § 72-2-18(A) (Supp. 2001).

Under these New Mexico statutes, the Compliance Order at issue in this case "is presumed to be in proper implementation of the provisions of the water laws administered by" the State Engineer. Id. § 72-2-8(H). While Plaintiffs raise a number of questions about the validity of the Compliance Order, their motion does not seek any injunctive relief against the Office of the State Engineer. In addition, Plaintiffs have not shown that the administrative remedies available at law for challenging the Compliance Order are inadequate, and the record is not sufficiently developed to support a determination that Plaintiffs are substantially likely to prevail on the merits of the claim for which injunctive relief is sought.[1]

The administrative procedures for challenging the Compliance Order are set forth in N.M. Stat. Ann. §§ 72-2-16 through -18. Under New Mexico law, "'[j]urisdiction of the matters in dispute does not lie in the courts until the statutorily required administrative procedures are fully complied with. The courts have no authority to alter the statutory scheme, cumbersome as it may be.'" El Dorado Utils., Inc. v. Galisteo Domestic Water Users Ass'n, 120 N.M. 165, 167, 899 P.2d 608, 610 (Ct. App. 1995) (quoting In re

---

[1] Defendants have raised a number of jurisdictional arguments in response to Plaintiffs' motion. At this preliminary juncture, the Court considers such jurisdictional arguments only for purposes of ruling on Plaintiffs' motion. The Court defers ruling on the broader question of whether this case should be dismissed for lack of subject-matter jurisdiction until Defendants' motion to dismiss has been fully briefed.

Application of Angel Fire Corp., 96 N.M. 651, 652, 634 P.2d 202, 203 (1981)); accord Derringer v. Turney, 2001-NMCA-075, ¶ 5, 131 N.M. 40, 33 P.3d 40.

Plaintiff Limacher acknowledged that he received actual notice of the Compliance Order dated July 16, 2001, and was aware of Defendant Spivey's prior attempts to contact him. Through his counsel, Plaintiff Limacher also made at least one documented attempt to invoke the State Engineer's administrative procedure for challenging the Compliance Order under N.M. Stat. Ann. § 72-2-16. That attempt included a request for negotiation prior to a hearing. While the parties presented conflicting affidavits as to what, if anything, resulted from these efforts at negotiation, the evidence is not sufficient to establish that the Office of the State Engineer refused to hold a hearing, or that such a hearing would be futile at this juncture.[2] Moreover, Plaintiffs' motion does not seek to compel or prohibit any further action by the Office of the State Engineer with regard to the Compliance Order.

In addition to invoking, but not exhausting, the administrative procedures for challenging the Compliance Order, Plaintiff Limacher testified that he has applied to the Office of the State Engineer for a supplemental well permit to irrigate the pasture associated with the F. Hilbern Ditch. While the Office of the State Engineer has not yet ruled on this permit application, Plaintiff Limacher has not shown that he has been denied a hearing on this application, or that the application procedure is so cumbersome as to render the

---

[2] Although Defendants initially argued in their written response to Plaintiffs' motion that Plaintiffs lacked standing to pursue an administrative appeal of the Compliance Order pursuant to N.M. Stat. Ann. § 72-2-18, they later conceded at the hearing that Plaintiff Limacher could proceed with his administrative appeal as a "person aggrieved" under N.M. Stat. Ann. § 72-2-16. The Court is not persuaded that an administrative appeal would be rendered futile by a lack of standing.

application futile. Plaintiffs' motion does not seek to compel the Office of the State Engineer to act on Plaintiff Limacher's permit application.

New Mexico law also contains provisions for permitting the construction of dams, see N.M. Stat. Ann. § 72-5-32, and making changes to the point of diversion, see id. § 72-5-24. An expedited procedure for making such changes is available when the delay caused by the usual permitting process "would result in crop loss or other serious economic loss to the appropriator and . . . the state engineer determines that no foreseeable detriment exists to rights of others having valid and existing rights to the use of the waters of the stream system." Id. § 72-5-25(A). Plaintiffs have elected not to pursue any remedies available under these statutes. Such an election does not necessarily mean that these statutory procedures are unavailable or inadequate.

"Intervention by the [federal] courts preceding exhaustion of available administrative remedies should be exercised only under circumstances where the facts clearly establish that fundamental rights and interests of the private party are being harmed and cannot be adequately redressed by permitting the administrative process to pursue its course." Franks v. Nimmo, 683 F.2d 1290, 1295 (10th Cir. 1982); see generally 13 James Wm. Moore, supra, § 65.06[4], at 65-23 to 65-24 (discussing similarities between the rule requiring exhaustion of administrative remedies and the rule that a plaintiff may not obtain injunctive relief if an adequate remedy at law is available). At this preliminary juncture, Plaintiffs have not clearly established such facts.

Plaintiffs contend that their inability to construct the diversion dam will result in the irreparable loss of their water rights. Loss of rights to real property generally constitutes an injury that is irreparable when the property at issue is unique, such as a parcel of land. See Amkco Co. v. Welborn, 2001-NMSC-012, ¶ 11, 130 N.M. 155, 21 P.3d 24. While water rights in New Mexico are generally recognized as real property, see Elephant Butte Irrigation Dist. v. Regents of N.M. State Univ., 115 N.M. 229, 238, 849 P.2d 372, 381 (Ct. App. 1993), it does not necessarily follow that a particular quantity of water has the same attribute of uniqueness that would render its loss irreparable or not compensable.

In this instance, there has been no showing that the absence of preliminary injunctive relief against the Hurd Defendants will result in the forfeiture or abandonment of Plaintiffs' water rights, or rights to real property associated with the F. Hilbern Ditch. Cf. N.M. Stat. Ann. § 75-2-28 (listing criteria for forfeiture of water rights). Rather, Plaintiff Limacher's testimony only shows that he is suffering economic losses, or increases in the cost of doing business, as a result of his alleged inability to divert a sufficient amount of water from the F. Hilbern Ditch to irrigate one of his pastures. Such economic losses or increases in the cost of doing business generally do not constitute irreparable harm because a party can be compensated for such losses or increases at a later date. See Tri-State Generation & Transmission Ass'n, Inc. v. Shoshone River Power, Inc., 805 F.2d 351, 355 (10th Cir. 1986) ("Injury is generally not irreparable if compensatory relief would be adequate."); cf. Frank Bond & Son, Inc. v. Reserve Minerals Corp., 65 N.M. 257, 258-62, 335 P.2d 858, 859-61 (1959) (affirming an award of damages for "the value of water taken" from a stock

tank plus "expenses and costs due to the loss of the water, such as having to move cattle from the range or having to use other range for the cattle").

Further, the level of economic loss alleged by Plaintiffs cannot be characterized as catastrophic or immeasurable. Plaintiff Limacher, who was the only Plaintiff to testify at the hearing on Plaintiffs' motion, testified that he was able to irrigate some of the pastures on his property from other sources and to purchase alfalfa to supplement or replace the forage allegedly lost from the inability to irrigate the pasture associated with the F. Hilbern Ditch. In addition, Defendant Spivey submitted photographic evidence showing that standing water was on some of Plaintiff Limacher's fields on a date subsequent to the filing of Plaintiffs' motion.

While the Court does not doubt that the current situation presents a significant hardship to Plaintiff Limacher, the harm to Plaintiffs must be balanced against the harm to others that is likely to result if preliminary injunctive relief were granted. See SCFC ILC, Inc., 936 F.2d at 1098; 13 James Wm. Moore, supra, § 65.22[1][e], at 65-50- to 65-51. Water is a scarce resource in New Mexico, and the likely result of enjoining Defendants from breaching the type of dam that Plaintiffs seek to construct on the Rio Ruidoso is that less water will be available to downstream users. Indeed, this controversy first arose from complaints by other property owners and downstream water users. Defendant Spivey based her recommendations for issuing the Compliance Order in part on her research indicating the presence of downstream water users with senior water rights. At this preliminary juncture,

the evidence and testimony presented by Plaintiffs has failed to establish that such downstream senior water rights do not exist.

In addition, Defendant Spivey observed that the dam constructed by Plaintiffs was causing erosion of the river bank and leaving stagnant pools of water downstream on Defendant Hurd's property. The dam's environmental impacts on others' property must be considered in weighing the relative hardships faced by each of the parties.

Finally, the interests of the Office of the State Engineer and the public must be taken into account. The State of New Mexico has an important interest in the waters flowing within it, and the State Engineer has an important interest in determining the scope of its supervisory authority over such waters. These interests were previously acknowledged in Lewis, 1996-NMCA-019, 121 N.M. at 327, 910 P.2d at 961, wherein the State Engineer argued that exempting certain appropriations of water from statutory permit requirements applicable to dams and ponds "'would render the state engineer's administrative authority impotent, would allow for virtual unlimited appropriation of water and, ultimately, impair every prior existing water right.'" While the Lewis court concluded that such "potential problems" were for the Legislature to resolve, id., the Legislature promptly responded by amending the statute to eliminate the exemption in 1997. See N.M. Laws 1997, ch. 66, § 1 (codified at N.M. Stat. Ann. § 72-5-32). In requesting preliminary injunctive relief against the Hurd Defendants, Plaintiffs seek to circumvent such permitting requirements or, at a minimum, deprive the Office of the State Engineer of the opportunity to determine, in the first instance, whether such permitting requirements apply in this case. The Court concludes

that the hardships Plaintiffs face without the benefit of a preliminary injunction are outweighed by the harms to downstream water users, other property owners, the State Engineer, and the public interest that are likely to result if Plaintiffs' motion were granted. See SCFC ILC, Inc., 936 F.2d at 1101.

## III. CONCLUSION

For the foregoing reasons, the Court concludes that the equitable factors listed above do not weigh in favor of granting a preliminary injunction in this case. This conclusion makes it unnecessary for the Court to address Defendants' request that Plaintiffs be required to post a bond or other security under Fed. R. Civ. P. 65(c).

**IT IS THEREFORE ORDERED** that Plaintiffs' Motion for a Temporary Restraining Order and/or Preliminary Injunction is **DENIED**.

**SO ORDERED,** this 31st day of July, 2002, in Albuquerque, New Mexico.

_____
**M. CHRISTINA ARMIJO**
United States District Judge